54 Cal.App.3d 172 (1975)
126 Cal. Rptr. 432
Estate of RICHARD H. LACY, Deceased.
SECURITY PACIFIC NATIONAL BANK, as Co-trustee, etc., et al., Petitioners and Respondents,
v.
HELEN FITZPATRICK et al., Objectors and Appellants.
Docket No. 43805.
Court of Appeals of California, Second District, Division Four.
December 31, 1975.
*176 COUNSEL
Forgy, Thamer & Inadomi and Don C. Thamer for Objectors and Appellants.
Meserve, Mumper & Hughes and J. Robert Meserve for Petitioners and Respondents.
OPINION
COLE (John L.), J.[*]
Helen Fitzpatrick, Helen Hillary Thamer (also known as Helen Fitzpatrick Thamer), Katherine Thamer, Mary Theresa Thamer, and Hillary Lacy Thamer appeal from an order of the probate court settling the report and 22d account current of the trustees under a testamentary trust. Appellants Helen Fitzpatrick and Helen Hillary Thamer are referred to hereafter as the income beneficiaries. We reverse the order as to them, but only because reversal is required as to the remaining appellants. The other three appellants are hereafter sometimes collectively referred to as the remaindermen. As we discuss below, the proper resolution of the appeal of the remaindermen depends on whether or not the respondent trustees knew, or should have known with due diligence of the existence of these remaindermen. We reverse the order as to them with directions to the trial court to determine this question and to thereafter proceed in a manner consistent with this opinion.

Timeliness of Notice of Appeal
(1) Notice of entry of the order settling the report and account current of the trustees was mailed on April 26, 1973. The notice of appeal was filed on July 3, 1973, some 68 days later. Thus, the notice was not filed within the 60-day period provided by rule 2 (a), California Rules of Court, (hereafter "rules"). To be timely, resort must be had to some other provision of the rules. We are satisfied that the notice of appeal was filed in time, since the "Notice of Motion to Set Aside Submission and to Re-Open Cause" (filed on May 1, 1973, and denied on June 1, 1973, by a formal order entered on June 5, 1973) extended the time for notice of appeal under rule 3 (b). Rule 3 (b) states, in applicable part, "When *177 a valid notice of intention to move to vacate a judgment or to vacate a judgment and enter another and different judgment is served and filed by any party on any ground within the time in which, under rule 2, a notice of appeal may be filed, ... and the motion is denied ... the time for filing the notice of appeal from the judgment is extended for all parties until 30 days after entry of the order denying the motion to vacate...."
It has been stated that rule 3 (b), applies to any valid notice of intention to move to vacate a judgment on any ground. (Duncan v. Sunset Agricultural Minerals (1969) 273 Cal. App.2d 489, 491-492 [78 Cal. Rptr. 339].) The motion to set aside submission, however awkwardly titled, was a valid motion, being promptly filed and challenging the order settling the account on the ground that the movants had not received notice of the hearing. (See Olivera v. Grace (1942) 19 Cal.2d 570, 573-574 [122 P.2d 564, 140 A.L.R. 1328].) It was filed within the time in which a notice of appeal could be filed under rule 2. Its denial was entered on June 5, only 28 days from the filing of the notice of appeal on July 3. While the motion was filed only on behalf of remaindermen, the rule provides that a motion filed "by any party" extends the time to file the notice of appeal "for all parties." The notice of appeal, therefore, was filed on time. We turn to a discussion of the merits.

Facts
Pursuant to the will of Richard H. Lacy, a decree of partial distribution made in 1947, established a trust of which respondents are now the trustees. The decree of final distribution in 1948 again set forth the terms of the trust. The trust was, and is possessed of sizable assets. Under the decree an equal one-fifth share of the income was left to each of decedent's four daughters.[1] Appellant Helen Fitzpatrick, one of the income beneficiaries, was the daughter of decedent. Under the trust, as each daughter dies, her share of the income is to go to her lawful issue. Appellant Helen Hillary Thamer is the daughter of Helen Fitzpatrick and a granddaughter of decedent, and is a contingent income beneficiary. The only right of the income beneficiaries is to receive income. The decree of distribution specifically denies to them any other ownership of or interest in the trust estate.
The trust is to end on the death of the survivor of decedent's grandchildren living at the time of his death. The present ages of those *178 grandchildren range from 39 to 54. On the death of the last of them (there are 12 in all) the trust is to terminate and the assets are to be distributed to the great grandchildren of decedent. Among those are the three remaining appellants, all of whom are daughters of Helen Hillary Thamer, and hence are remaindermen.
The report and 22d account current of the trustees covered the period July 13, 1969, to July 12, 1971. The petition seeking its approval asked, and the court ultimately awarded, ordinary fees for the trustees in the amount of $29,000 for the period July 13, 1969, through July 12, 1970, and the sum of $27,500 for the period July 13, 1970, through July 12, 1971. The decree of distribution provided that the trustees should receive compensation of three-fourths of one percent of the reasonable value of the trust estate. The bank trustee (there is an individual trustee also) revalued the assets of the trust for fee purposes at a figure it believed to be below the actual value obtainable on the open market for the assets. The ordinary fees requested and awarded were less than the three-fourths of one percent of these assets.
The bank trustee also asked for and was awarded extraordinary fees of $25,000 (the individual trustee waived a claim for any extra fee). A request was also made for $5,000 fees for the trustees' attorneys which were allowed. The claim was based on the following facts. The trust owns some real property on Grand Avenue in the heart of downtown Los Angeles on which there was a one story building long occupied by a cafeteria. The cafeteria lease expired on June 30, 1969. Prior to the accounting period the trustees determined that it was necessary to perform extensive renovations and repairs on the building in order to conform to code requirements and to increase the level of income that could be derived from the property. After much preliminary negotiation and consultation with architects and contractors, renovation work started in July of 1969, first with demolition and then with reconstruction. The bank trustee caused securities owned by the trust in the aggregate in excess of $900,000 to be sold to finance the reconstruction. A total of $842,677.01 of the proceeds was spent by the trustees to defray the cost of the project. Long term leases were entered into with three tenants for the reconstructed building. Whereas the cafeteria lease had produced a net income of approximately $20,000 annually to the trust the new building produced an income of approximately $116,000. Personnel of the bank spent 980 hours on the project. We are not told how many of these were spent prior to the accounting period commencing July 13, 1969.
*179 At this point it is convenient to bifurcate our discussion and to deal separately with the issues presented on appeal by the two income beneficiaries and then with the issues raised by the remaindermens' appeal.

The Appeal of the Income Beneficiaries
The income beneficiaries objected to the petition for approval and allowance of fees. Their objections related solely to the request for fees. It was claimed that the corporate trustee was not entitled to extra fees because ordinary fees were sufficient, because the acts of the trustees were not extraordinary and because the petitioners did not meet their burden of showing of extraordinary services. It was also claimed that the trustees were not entitled to re-evaluate trust assets for the purpose of determining their ordinary fees because the increase in values was due to inflation and not the trustees' efforts. Complaint was also made that the valuation of the assets did not reflect the reasonable value of the estate on the date used for computing trustees' fees. It was also claimed that the court should order a modification of the ordinary fee rate of three-fourths of one percent, and that the petition was not detailed enough.
The hearing on the objections consumed approximately four half days. Various representatives of the bank testified in support of the allegations of the petition. As indicated above, the court awarded the extraordinary fees requested by the bank in the amount of $25,000 and as well the attorneys' fees for services to the bank-trustee.
(2a) The income beneficiaries now allege that the evidence was insufficient to show that the trustees' services were unusual and extraordinary. The purport of this argument is that many evidentiary errors occurred and that when all of the matter to which the errors relate is stricken there is no evidence left to support the award.
Much evidence, sufficient to sustain the findings that extraordinary services were rendered and to uphold the court in its exercise of discretion to award extraordinary fees, was received. Thus, it was stipulated that the building on Grand Avenue property had been completely renovated.
*180 It is not disputed that the aggregate rents, net to the trust, were increased from approximately $20,000 per year to $116,000 per year. The real estate trust officer so testified, by references to the leases.[2]
There was ample testimony by the two bank officers referred to that an estimated 980 hours were spent on the project.[3] Similarly, there is evidence from a third bank officer, an appraiser whose expertise was stipulated, that the 1969 valuation of the Grand Avenue property was $500,000, representing a $300,000 increase over the previous year's value, as a result of the appreciation in the value of the property; that one year later the valuation of the property was $600,000 again based on real estate values and that the valuation of the property in 1971 at the completion of the project was $1.3 million. This witness worked personally with other appraisers to arrive at these figures.
Each of the first two bank witnesses testified that services of this nature were beyond those included in the definition of ordinary services. Clearly this evidence alone was sufficient to justify the trial court's finding.
(3) The allowance of extraordinary fees, and if they are to be awarded their amount, is a matter within the discretion of the trial court. (Prob. Code, § 1122; Estate of Gilliland (1971) 5 Cal.3d 56, 59 [95 Cal. Rptr. 343, 485 P.2d 543]; see Prob. Code, § 902 and Estate of Skinker (1956) 47 Cal.2d 290, 297 [303 P.2d 745, 62 A.L.R.2d 1137].) On appeal where the amount of fees awarded to testamentary trustees is attacked as excessive the sole question is whether substantial evidence supports the award. (Gilliland, supra, at p. 59.) As indicated above, it does.
(2b) While it is clear that many evidentiary errors did occur at the hearing,[4] in light of the above discussion we cannot hold that they were prejudicial.
*181 Only two of the other contentions made with respect to the allowance of fees require comment. Citing Estate of Walker (1963) 221 Cal. App.2d 792 [34 Cal. Rptr. 832], appellants argue that even though the trustees' services were of an extraordinary character the trustees were not entitled to additional fees as they were adequately compensated by the ordinary fees. As noted, the setting of extraordinary fees is vested in the discretion of the trial court. Walker merely affirmed an order of the trial court denying extraordinary fees even though extraordinary services were rendered. Similarly, we agree that the trial court did not abuse its discretion in allowing extraordinary fees here.
(4) It is also urged that the trustees should not be entitled to revalue the assets on a current basis in order to compute their ordinary fees when, it is urged, increases in the value of the trust assets were due to inflation and not to their own efforts. Principal reliance is placed on Estate of Guasti (1953) 117 Cal. App.2d 612 [256 P.2d 629]. There the court said that where assets have appreciated in value due to efforts of the trustees, the latter are entitled to have the increased amount taken into account in fixing the amount of their fees. The case did not hold that increases due to inflation could not be measured. In the present matter *182 the appraiser-witness testified to a substantial increase in the value of the property, taking into account the renovated building and the new leases. That he also testified to a general increase in land values in downtown Los Angeles does not detract from the former testimony.
Other points raised in connection with the amount of fees have been considered and found to be without merit.
(5) Finally, appellants complain that the matter was heard before a superior court commissioner and that no stipulation was entered into authorizing him to sit as a temporary judge. Reliance is placed on Mosler v. Parrington (1972) 25 Cal. App.3d 354 [101 Cal. Rptr. 829], where a defendant failed to appear at the time of the hearing on a motion to strike an answer and it was held improper for a commissioner to act. However, the facts of this case are close to and are governed by Estate of Soforenko (1968) 260 Cal. App.2d 765 [67 Cal. Rptr. 563]. There, as here, a party was represented by an attorney who appeared, voiced no objections to the matter being heard by a commissioner and participated fully in the hearing, strenuously examined the witnesses and argued the evidence. Such conduct was deemed tantamount to a stipulation that the matter could be heard by a commissioner. (See also People v. Oaxaca (1974) 39 Cal. App.3d. 153 [114 Cal. Rptr. 178]; but see Lovret v. Seyfarth (1972) 22 Cal. App.3d 841, 853 [101 Cal. Rptr. 143].) That is the situation here, counsel in fact stating in a declaration filed with a motion for new trial that he was aware of the constitutional requirement that there be a stipulation in order that a case may be tried by a temporary judge. An attorney may not sit back, fully participate in a trial and then claim that the court was without jurisdiction on receiving a result unfavorable to him.
We find no reversible error in the court's determination of the issues presented to it by the income beneficiaries. For reasons to be discussed we must, however, reverse the order in connection with the appeal of the remaindermen. It cannot, without potential inconsistency, be left intact as to the income beneficiaries. We must reverse as to them also.

The Appeal of the Remaindermen
Two of the remaindermen, Marie Theresa Thamer and Hillary Lacy Thamer, were first heard from in this action on March 20, 1973, when their mother petitioned to be, and was, appointed as their guardian ad litem. The third of them, their older sister, Katherine Thamer, first came *183 onto the scene shortly after reaching her majority. After the trial court had made its order settling the report and 22d account current a notice of motion to set aside the submission and re-open the cause was filed on May 1, 1973, on her behalf, as well as that of the other remaindermen. Appended to that motion, among other things, were declarations by Katherine Thamer and her father, Attorney Don Thamer, stating that no notice of hearing on the settlement of the trustees' account was sent to any of the three appellant remaindermen or to any other of the remainder beneficiaries of the trust. Also attached to the notice of motion were proposed contests by the remaindermen, separately filed by Katherine Thamer and by her minor sisters through their mother as guardian ad litem. Among the grounds of contest proposed to be asserted is the allegation that the trustees invaded the trust corpus for the support of the income beneficiaries at the expense of the remaindermen. It is urged that the sale of trust securities to raise funds to renovate the Grand Avenue property was carried out at a substantial loss in order to generate funds to increase the income to the income beneficiaries. The remaindermen also asserted several new grounds of contest not previously urged by the income beneficiaries. They revolved around the lack of notice of hearings and around claims that the trustees' actions in renovating and rebuilding the property were in excess of their trust powers, and an abuse of the trustees' discretion.
The substantive grounds cannot be determined by us for the first time on appeal. They involve issues of fact as to which testimony is necessary. (6a) We address ourselves to the question whether the remaindermen are bound by the order already made. As will be seen, it is necessary for us to return the case to the trial court and for it to first determine if the order is binding on the remaindermen or void for lack of service of notice.
The newly presented substantive questions will never be reached if the trial court determines that service was valid. We now turn to a discussion of that issue.
Probate Code, section 1120, provides with respect to hearings upon trustees' accounts and reports and petitions for settlement or instruction that "[T]he trustee shall cause notice of the hearing to be mailed to the beneficiaries including all persons in being who shall or may participate in the corpus or income of the trust, at their last known addresses, as provided in ... Section 1200, whether they have requested special notice or given notice of appearance or not...." (Italics added.) The clerk is also *184 required to give the notice specified by Probate Code, section 1200, which requires posting at the courthouse and such notice was given here.
It is not disputed that notice was not mailed to the remaindermen. The record reflects only the allegation of the report and account current itself that "the following is a complete list of the names and last known addresses of the beneficiaries and remaindermen of said trust" followed by a list of names not including those of the appellant remaindermen.[5]
Katherine Thamer made a general appearance in the proceedings when she joined her sisters on May 1, 1973, in filing the notice of motion to set aside the submission and to re-open the cause.[6] At the time of this motion she had reached her majority. In support of the motion and the proposed contest of the petition she alleged the substantive objections discussed above. The other two remaindermen who are appellants here, Mary Theresa Thamer and Hillary Lacy Thamer, are minors. Any purported appearance by them was made through their mother, appellant Helen Fitzpatrick Thamer, appearing as their guardian ad litem.[7] Guardians ad litem are appointed to protect the interests of minors, not to defeat them. (Prob. Code, § 1607; Briggs v. Briggs (1958) 160 Cal. App.2d 312, 319 [325 P.2d 219]; Doyle v. Loyd (1941) 45 Cal. App.2d 493, 496-497 [114 P.2d 398].) It would be anomalous to conclude that the motions filed here, presumably through the guardian ad litem, resulted in cutting off the minors' rights before they could be determined.
(7) Of more moment is the obvious adverse interest of Helen Fitzpatrick Thamer, an income beneficiary, to the position asserted in the post-order motions by the remaindermen. It is true, as respondents point out, that in the petition that resulted in her appointment as guardian ad litem it was recited that she had "no interest adverse" to any *185 of her children.[8] But the grounds of contest alleged show that, as a matter of law, the remaindermen are asserting issues directly contrary to the interests of the income beneficiaries. The notice of motion to set aside and re-open made on behalf of the remaindermen states, among other things, that it is based on grounds "that Trustees wrongfully sold assets of the Trust Estate... that the Trustees invaded the Trust corpus for the support of income beneficiaries, that Trustees during the accounting period acted adversely to remainder beneficiaries...." In support of the motion counsel for appellants filed a declaration stating, inter alia, that evidence would be presented "that the corpus of the Trust was utilized for increasing income to the income beneficiaries at the expense of the remainder beneficiaries."
It was clearly improper to appoint as guardian ad litem one who, however well intentioned, inevitably is in an adverse position to the minors for whom she purports to act. An adverse interest is a ground for removing a guardian ad litem (Estate of Emery (1962) 199 Cal. App.2d 22, 26 [18 Cal. Rptr. 86]) a general guardian (Prob. Code, § 1580, subd. (5)) and a conservator (Prob. Code, § 1951, subd. 5). In litigation involving conflicting interests of a minor and his parent in a testamentary trust, it has been held, a guardian ad litem should be appointed but "the trial court should not appoint the minor's father ... as such representative because of the legal conflict existing between the father and the son...." (Estate of High (1967) 250 Cal. App.2d 561, 568 [58 Cal. Rptr. 694] [italics in original]; see also Townsend v. Tallant (1867) 33 Cal. 45, 52; Loock v. Pioneer Title Ins. etc. Co. (1935) 4 Cal. App.2d 245, 249 [40 P.2d 526].)
For these reasons, on remand the trial court should vacate the appointment of Helen Fitzpatrick Thamer as guardian ad litem for any remaindermen, and appoint someone else in her stead.[9]
*186 (6b) We return, then, to our inquiry whether the failure of respondents to give notice of the hearing of the order to the remaindermen invalidates the proceedings below. That failure was in literal violation of the requirement of Probate Code section 1120 that notice be sent "to the beneficiaries including all persons in being who shall or may participate in the corpus or income of the trust at their last known addresses."
We note, but reject, respondents' argument that it made no practical difference that the remaindermen did not receive notice since their mother did, and their father was her counsel. A failure to give notice cannot be treated that simplistically. Even though the notice would have gone to the children at the same address as their parents the very fact of separate notice might have been sufficient to suggest, to them if they were of sufficient age, and certainly to their parents, that the children's interests are separate and distinct as remaindermen from those of the mother as a contingent income beneficiary. In any event the language of Probate Code section 1120 does not permit of surrogate notice. Had this matter involved service of summons on the minors, a parent would have had to be served, and Mary Theresa Thamer, who was over 12 years of age, would have had to be served as well. (Code Civ. Proc., § 416.60.) Such statutory requirements have been stringently applied. (See Akley v. Bassett (1922) 189 Cal. 625, 639 [209 P. 576]; Bank of America v. Carr (1956) 138 Cal. App.2d 727, 737 [292 P.2d 587]; cf. Miller v. Superior Court (1961) 56 Cal.2d 49, 51 [13 Cal. Rptr. 673, 362 P.2d 497, 92 A.L.R.2d 1332].)
We must consider whether Probate Code section 1120 is as absolute in its terms as its language suggests.[10]
In answering this question, at least three perhaps conflicting factors must be taken into account: the need for finality in probate proceedings *187 so that stability is accorded to transactions of personal representatives and testamentary trustees approved by the court; practical consequences of trust administration; and, constitutional requirements of due process.
In order to give finality to probate proceedings it has been held that "... Once a decree of the probate court settling an account of a trustee becomes final, it is conclusive, in the absence of extrinsic fraud, on all parties interested in the estate...." (Estate of Charters (1956) 46 Cal.2d 227, 234 [293 P.2d 778]; Prob. Code, § 1123.[11])
Thus, proceedings connected with the administration of probate matters and testamentary trusts have been regarded as being in rem. Rigid application of this concept meant that even though notice of a proceeding was not given to a known trust beneficiary, a previous final order of the probate court was not subject to collateral attack on that ground unless the order was void on its face. The fact that personal notice was lacking was held not to deprive any person in interest of any of his constitutional rights. (Security First Nat. Bk. v. Superior Court (1934) 1 Cal.2d 749, 755-756 [37 P.2d 69]; see also Murray v. Superior Court (1929) 207 Cal. 381, 385 [278 P. 1033].)
The United States Supreme Court has now made it clear that blind labeling of probate proceedings as "in rem" does not satisfy constitutional requirements of due process. (8) Those requirements mandate that "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations omitted.] ... of such nature as reasonably to convey the required information ... and [affording] a reasonable time for those interested to make their appearance, ..." is necessary to meet constitutional standards. (Mullane v. Central Hanover Tr. Co. (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 873, 70 S.Ct. 652].)
(6c) Recognizing the impact of Mullane, it was held in Estate of Reed (1968) 259 Cal. App.2d 14 [66 Cal. Rptr. 193], that Mullane had modified Security, and that the failure of a testamentary trustee to give notice to known residuary beneficiaries made void a prior order. In Reed, there was no dispute that the trustee in fact knew about the residuary beneficiaries and that their addresses were available. (259 Cal. App.2d at *188 p. 16.) The principle has been stated as follows: "When conducting a proceeding which may result in the termination of a citizen's title to property, government denies due process of law to a known, interested party if it fails to give him adequate notice of its action. [Citations omitted.] Notice given according to statutory ritual will not necessarily meet due process standards: `[t]he means [of notice] employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.' (Mullane v. Central Hanover Bank & Trust Co., supra, at p. 315 [94 L.Ed. at pp. 873-874].) As to known persons with known addresses, `[e]xceptions in the name of necessity do not sweep away the rule that within the limits of practicability notice must be such as is reasonably calculated to reach interested parties. Where the names and post-office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency.' (Id., p. 318 [94 L.Ed. at p. 875].) ..." (Dohrmann Co. v. Security Sav. & Loan Assn. (1970) 8 Cal. App.3d 655, 664 [87 Cal. Rptr. 792].)
Thus, if respondents knew of the existence of the remaindermen at the time of filing the petition seeking approval of the trustees' account and did not give notice of the hearing to the remaindermen, Mullane, Reed and Dohrmann all indicate that such failure would render void the order approving the account.
Obviously, section 1120 could be literally read so as to require notice to be mailed "to the beneficiaries, including all persons in being who shall or may participate in the corpus or income of the trust, at their last known addresses ..." without exception. Such a requirement clearly would insure due process. At the same time, however, it might well make it practically impossible to administer some trusts. If a trustee truly did not know of the existence of an actual or potential beneficiary and thus failed to give notice to him, the possibility of a future attack on a trust transaction would create an instability "to the extent that certainty and repose in the chain of title to decedents' estates would be greatly diminished...." (Lilienkamp v. Superior Court (1939) 14 Cal.2d 293, 304 [93 P.2d 1008]). The United States Supreme Court in Mullane v. Central Hanover Tr. Co., supra, 339 U.S. 306, recognized that notice is not always required to satisfy due process requirements. Speaking of cases where the interests or whereabouts of trust beneficiaries could not be ascertained with due diligence, the court said "... We recognize the practical difficulties and costs that would be attendant on frequent investigations into the status of great numbers of beneficiaries, many of whose interests *189 in the common fund are so remote as to be ephemeral; and we have no doubt that such impracticable and extended searches are not required in the name of due process. The expense of keeping informed from day to day of substitutions among even current income beneficiaries and presumptive remaindermen, to say nothing of the far greater number of contingent beneficiaries, would impose a severe burden on the plan, and would likely dissipate its advantages. These are practical matters in which we should be reluctant to disturb the judgment of the state authorities." (339 U.S. at pp. 317-318 [94 L.Ed. at p. 875].)
For similar reasons we believe that section 1120 should not be literally read so as to require the giving of notice to unknown beneficiaries. Such a requirement would in some cases be impossible of fulfillment.
The present case does not involve a fact situation with as many beneficiaries and contingent remaindermen as were involved in Mullane. Nevertheless, a brief filed herein shows that in 1974, 29 years after the death of the trustor, he had at least 38 living great grandchildren. Additional ones may be born from time to time and they may live in far flung places. The difficulties in ascertaining their existence and location each time a notice is to be sent might make service impossible if the statute was to be literally applied with qualification. A factual question exists here as to the trustees' knowledge.
We find support for our holding in the 1974 enactment of new sections 1215-1215.4 of the Probate Code. Those sections were enacted with the expressed intent "to clarify and restate the notice requirements" of various sections of that code, including section 1120, in order "to recognize, by statute, the principle of virtual representation, ..." (Stats. 1974, ch. 171.) (9) When the Legislature states that its intent is to "clarify" existing legislation, the new enactment, while not binding on the courts, may properly be considered in determining the effect of a prior act. (California Emp. etc. Com. v. Payne (1947) 31 Cal.2d 210, 213-214 [187 P.2d 702].)
(6d) Section 1120 has not itself been amended. The 1974 statute is not directly involved in this appeal. We need not, and do not, purport to interpret it or to express any opinion as to its constitutional sufficiency in the light of Mullane v. Central Hanover Tr. Co., supra, 339 U.S. 306. We note that in light of the conflict of interest between the income beneficiaries and the remaindermen, the new statute would not authorize service on the mother as a substitute for notice to the remaindermen. *190 (§ 1215.2.) However, the legislative "clarification" of the statute indicating that the doctrine of virtual representation was intended to apply to the giving of notice under section 1120 suggests that that section was not intended to be rigidly applied.
We also find support for our conclusion in the fact that section 1120 requires that the notice which is to be sent to all persons in being is to be mailed to them "at their last known addresses." Simple logic would dictate that if the trustees had no knowledge of the existence of a beneficiary, it could not know the latter's address. While not conclusive by itself, this factor is an indication that the section was not intended to be read in a literally absolute way.
We hold, then, that the requirement of mailed notice appearing in section 1120 applies only to persons in being whose existence is, or in the exercise of due diligence should be, known to the trustees. This holding does no violence to constitutional concepts, recognizes the practical problems of trust administration and, at the same time, gives effect to the fact that probate decrees must have stability by requiring that notice be given not only to those known to the trustees, but also those whose existence should have been known to them.
The record on this appeal is not sufficient to enable us to determine whether the existence of the remaindermen was or was not known to the trustees.[12] The trial court should conduct a hearing to determine this point. If it is determined that the trustees did not know nor have reasonable means to ascertain the existence of the remaindermen, then publication by posting of notice of the hearing as required by Probate Code section 1200 and found to have been given here would be constitutionally sufficient. (Mullane, supra, at p. 317 [94 L.Ed. at p. 875].) In these circumstances, the court could then again enter its order granting the petition of the trustees and settling their account.
If it should be found, however, that the trustees did know, or in the exercise of due diligence should have known, of the existence of these *191 remaindermen, then the order appealed from is void. In such circumstances new notices should be given and new hearings held on the issues tendered.
The order appealed from is reversed. Appellants Katherine Thamer, Mary Theresa Thamer and Hillary Lacy Thamer shall recover their costs of appeal from respondents. The other appellants shall bear their own costs of appeal, as shall the respondents.
Files, P.J., and Jefferson, J.,[*] concurred.
NOTES
[*] Assigned by the Chairman of the Judicial Council.
[1] The fifth income share was left to the issue of the fifth daughter.
[2] While a best evidence objection was probably erroneously overruled, the facts concerning the existence of the new leases and the amount of rent produced by them are in no way questioned. The error in the evidentiary ruling, if any, was clearly harmless.
[3] Our attention is not directed to any evidence concerning whether part of the time was spent prior to the beginning of the accounting period involved here.
[4] The principal witnesses for the bank-trustee were two of its officers, one a trust officer in charge of the trust at issue, and the other a vice president and real estate officer in charge of the real estate trust division.

The thrust of the evidentiary objection is that these witnesses were allowed to testify, on the basis of records largely undescribed in the transcript, to matters with which they were not personally familiar. The trial court repeatedly expressed its disagreement with the position of appellants' counsel that the witnesses had to testify within the confines of the hearsay and best evidence rules. It repeatedly mistook counsel's argument on this point to mean that the bank had to call as a witness every single person, whether still employed or not who had had anything to do with the matters being testified about. The court made clear its position that it would not do this. This position misconceived the nature of the objection repeatedly made by counsel.
It was that simply because a witness was a corporate employee, he was not immune from the requirements of Evidence Code section 702, that, subject to the rules allowing opinion testimony into evidence "[T]he testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter.... A witness' personal knowledge of a matter may be shown by any otherwise admissible evidence, including his own testimony."
Perhaps understandably, counsel for appellants erroneously argues that the court considered the trustees' petition and answers to objections as if they were in evidence and also improperly took judicial notice of them. It is clear that the court initially intended to accept the unilateral "stipulation" of the trustees' counsel that the petition be considered to be in evidence subject to cross-examination. It is also clear that when counsel for appellants objected to this procedure the court said it would take judicial notice of the petition on its own motion. While undoubtedly such a cavalier procedure would have been error (see Estate of Fraysher (1956) 47 Cal.2d 131, 135 [301 P.2d 848]), the court retreated from this position and required appellants to proceed with the presentation of evidence.
Mr. Boucher then stated that everything in the petition was true. Appellants further objected that just as it would be error to consider the petition to be in evidence, absent a bilateral stipulation to that effect it was error to allow the witness to testify in so many words that everything that was alleged in the petition was true. Here again an objection that some of those matters were not within the witnesses' knowledge was overruled.
[5] The reference to remaindermen in the quoted material apparently refers to persons (all surnamed Hanna) who, it may be inferred from the record, are the great grandchildren of decedent through one of his other daughters.
[6] Similarly, on that date she joined with them in a motion for new trial and there argued that the trustees favored the income beneficiaries over the remaindermen.
[7] Preliminarily, this procedure in itself raises a number of questions. The motion to set aside and re-open was made in the name of the three appellant remaindermen, and was signed by Attorney Thamer only in his capacity as attorney for Katherine. Similarly, the new trial motion was made in the names of the three remaindermen (and the two income beneficiaries as well) but was signed by counsel as attorney for all five. Since it is the minor, and not the guardian ad litem who is the party (3 Witkin, Cal. Procedure (2d ed.) p. 1735), the failure to indicate that the mother was guardian ad litem can be overlooked.
[8] A second petition for appointment as guardian ad litem also appears in the record. In it Helen Hillary Thamer (the same person as Helen Fitzpatrick Thamer) seeks to be appointed as guardian ad litem for two other of her children, older than the two minor remaindermen appellants here and younger than Katherine Thamer, and as well asks that a guardian be appointed for the entire class of great grandchildren, ascertained, not ascertained, or not in being. In this petition it is asserted that the petitioner "at this time has no adverse interest" to the remaindermen. (Italics added.)
[9] We do not in any way imply any actual bad faith on the part of Mrs. Thamer. Similarly, without any imputation of bad faith, we note that the position taken by counsel for appellants necessarily must be inconsistent as between the income beneficiaries and the remaindermen. It has been held that a conflict of interest between two clients does not necessarily require that an attorney withdraw from a case or terminate the attorney-client relationship with one of the clients. (Lysick v. Walcom (1968) 258 Cal. App.2d 136, 146-147 [65 Cal. Rptr. 406, 28 A.L.R.3d 368].) Nevertheless, "[a]n attorney has a constant and perpetual rendezvous with ethics" and should not represent conflicting claims of two clients. (McClure v. Donovan (1947) 82 Cal. App.2d 664, 666 [186 P.2d 718].) It is prejudicial error for an attorney having acted for one side in a prior trial, to appear and act on behalf of the other in a subsequent trial. (Weidekind v. Tuolumne County Water Co. (1887) 74 Cal. 386, 388 [19 P. 173].)
[10] The first reference to giving notice to "all persons in being" appeared in 1953 in connection with parties seeking instructions to exercise powers not conferred upon the trustee. (Stats. 1953, ch. 696, § 1.) The present language of the statute relating to "all persons in being" was inserted in the 1963 statutory revisions (Stats. 1963, ch. 863, § 1), and the language limiting that requirement to situations where the trustee sought to exercise powers not conferred upon him was deleted. Prior to 1963 the statute called for notice of hearings on accounts to be mailed by the trustee "to the beneficiaries whose addresses are known." (§ 1120 as amended by Stats. 1933, ch. 969, § 14.)
[11] "A decree rendered under the provisions of this chapter, [dealing with testamentary trusts] when it becomes final, shall be conclusive upon all persons in interest, whether or not they are in being."
[12] During the pendency of these proceedings, we granted respondents' application to augment the record to include various documents which, it was contended, would show that respondent trustees did not have any knowledge of the existence of certain of the contingent remaindermen. Thereafter, appellants moved to admit into evidence on this appeal certain other letters which they contend would lead to a conclusion that respondents should have known of the existence of the contingent remaindermen. In light of our disposition, it is unnecessary to rule on this motion. These matters are well within the scope of the inquiry which we direct the trial court to undertake.
[*] Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.